UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA        :
                                :
                                :     Case no. 2:10-cr-141
        v.                      :
                                :
JOSEPH MAYHEW,                  :
                                :
            Defendant.          :

Opinion and Order:
Defendant's Motion to Suppress Statements and Evidence

Defendant Joseph Mayhew is charged with aiding in importing marijuana into the United States. Indictment, ECF No. 12. He moved to suppress statements and evidence obtained against him by federal agents. Mot. to Suppress, Jan. 25, 2011, ECF No. 19; Def.'s Post-Hr'g Mem. in Supp. of Mot. to Suppress, Oct. 6, 2011, ECF No. 45. For the reasons described below, the Court **denies his motion in part** and **grants it in part**.

I. Background

A. Factual Background[1]

On the night of October 15, 2010, U.S. Border Patrol agents Sean Lahan and Matt Palma were monitoring traffic from their

---

[1] The facts set forth below are based on testimony taken at hearings before the Court on May 9, June 2, and June 16, 2011, Hr'g Trs. vols. 1-3, ECF Nos. 30, 35, 36, and witness statements submitted by the parties prior to the suppression hearings, Mot. to Suppress Exs. A-D, Jan. 25, 2011, ECF Nos. 19-1 - 19-5; Resp. in Opp'n to Mot. to Suppress Exs. A-D, Feb. 7, 2011, ECF Nos. 22-1 - 22-5.

vehicles near Derby Line, Vermont.  They were watching Goodall Road, a rural dirt road about a quarter mile from the United States-Canada border that they considered to be a potential corridor for drug and human trafficking.  In the agents' belief, smugglers were likely to be active that night, using the cover of the cold, rainy weather.

1.  <u>Traffic Stops on Goodall Road</u>

At 10:19 pm, Agent Lahan stopped a minivan that was driving in a looping pattern along Goodall and neighboring roads.  The driver, when questioned, said he was out looking for deer. Agent Lahan, however, noticed that the car's back seats were lowered and that the scent of damp marijuana emanated from the vehicle.  Still, seeing no further evidence of illegality, he let the driver go without penalty and without requesting his driver's license or checking criminal record.  About an hour later, Agent Palma pulled over a black SUV that was tracing a similar looping path on Goodall Road.  He learned the man's name was William Emerson and that he was also out looking for deer. Agent Palma ran a check on the subject's background, finding a significant criminal history.  The car's back seats were lowered.  Agent Lahan, who assisted Palma, testified he thought he recognized Emerson as the same person he had pulled over earlier in the minivan.  But he did not pursue his suspicion

further at the time, and the agents let the SUV leave when they saw no evidence of contraband inside.[2]

## 2. Initial Stop on Goodall Road

At 12:48 am, a woman living on Goodall Road called 911. Agent Lahan testified that he heard a "report that there was a 911 call to the state police that two individuals" were at the woman's Goodall Road farm, asking either for a ride or to use the phone. Hr'g Tr. vol. 1, 26, 68, May 9, 2011, ECF No. 30.[3] Agent Lahan drove down Goodall Road to respond, taking action because he was already in the area and because he felt that men on foot at that hour, in that area, might be smugglers. He soon spotted two men walking along the road. He turned on his cruiser's flashing blue lights, parked, and exited the vehicle.

---

[2]     The agents later realized that Emerson had in fact been the driver of both cars. However, this discovery did not come until after they had found Mayhew's duffel bags of marijuana and returned to the station to question him and Driver further.

[3]     In the transcript of the call, the woman described the men as white with shaved heads and wearing "hooded sweat shirts and jeans. You know, like every other guy in Newport [a neighboring town]." Resp. in Opp'n to Mot. to Suppress Ex. A, at 2-3, Feb. 7, 2011, ECF No. 22-1. She complained that two men had knocked on her door asking to use her phone. The call was originally routed to the Vermont State Police. According to testimony from Border Patrol Agent John Garvey, who was also in the area and listening to the Vermont State Police's radio frequency, the State Police reported that they were too busy to respond to the call themselves but suspected the men might be aliens.

He ordered the men to put their hands on the cruiser's hood. They complied, and he frisked them.

About a minute later, at around 1:00 am, Agent Palma arrived at the scene. The two agents began asking the men questions, including requesting their names and reasons for being in the area. The men reported they were Joseph Mayhew, the defendant in this case, and Jeffrey Driver. Neither identification or a cell phone. Mayhew claimed the pair had been scouting deer but were abandoned by their ride, William Emerson, when they got out of his car to urinate by the side of the road. Hearing the connection to Emerson elevated the agents' suspicions since they had pulled him over earlier and discovered his criminal record. Also suspicious to Agent Lahan was that the men had no firearms with which to hunt deer or flashlights with which to spot them in the dark. Stranger still to the agents, the men were dressed in heavy, layered clothing and were dirty. At least one, Mayhew, was covered in burdocks, and wearing rubber boots. While Agent Lahan testified that "jacking deer is . . . pretty regular" in that part of the state, he was surprised that the men would have looked as if they had been in the woods rather than sitting in a car. Tr. vol 1, 31. Normally, according to Agent Lahan, the practice is to shoot deer from the car and have one person go into the woods to collect the kill. *Id.*

By about 1:15 am, more agents arrived at the scene, and
Agent Lahan "directed . . . two agents to place [Mayhew and
Driver] in . . . vehicles and separate 'em."  Hr'g Tr. vol. 1,
34.  Agent Lahan wanted to "keep them separated and detain them
while [he and other agents] looked for the narcotics" they
suspected the men had transported and hidden in the nearby
woods.  *Id.* at 35.

Agent Lahan had Mayhew sit in the backseat of Agent Scott
Seitz's cruiser and Driver sit in the backseat of Agent Palma's
unmarked Suburban.  Both cars' rear seats were separated by
caging from the front seats and had doors that could not be
opened from the inside.  Neither Mayhew nor Driver was
handcuffed, and Agent Lahan personally informed each man that he
was not under arrest.  According to Agent Lahan, agents asked
Mayhew and Driver for permission to question them further at a
nearby Border Patrol station, seven to ten miles away.
According to Lahan, Driver refused but Mayhew consented.
Agent Seitz drove Mayhew the ten to fifteen minute trip to the
station.  As far as the record indicates, Mayhew made no
comments related to the investigation during the ride.  Driver
remained at the scene in the backseat of Agent Palma's Suburban.
Also remaining at Goodall Road, Agent Lahan and two other agents
began searching for stashed narcotics in the neighboring woods.

### 3. Stationhouse Interview and Discovery of the Duffel Bags

At about 1:30 am, Mayhew arrived at the Border Patrol station.  Agent Seitz took his coat and led him inside, where Agent Garvey was also waiting.  Agent Seitz placed Mayhew into a holding cell, which was enclosed and contained some benches, a drinking fountain, and a small bathroom.  The agents described the station as having no space for interrogation other than two holding cells, although there were also offices for agents. Agent Seitz entered Mayhew's cell and began interviewing him. Mayhew repeated the story he had told Agents Lahan and Palma on Goodall Road.  Agents Seitz and Garvey continued to periodically enter the cell to interview Mayhew, keeping the door open while inside.  When not in the cell or watching Mayhew, they locked the cell door shut with Mayhew inside.  At around 2:00 am, a canine unit of the Newport, Vermont police, summoned at Agent Garvey's request, arrived at the station with a drug-sniffing dog.  The dog investigated Mayhew's coat and signaled positively for drugs.

Armed with the dog's identification, Agent Seitz returned to the holding cell to confront Mayhew.  Mayhew explained that he had been around marijuana smoke earlier that evening, which must have triggered the dog's alert.  He then asked Agent Seitz if he could go home to see his wife and children.  Agent Seitz relayed that request to Agent Garvey, who entered the cell to

6

speak with Mayhew directly.  He testified he told Mayhew,

"'[y]ou can see your wife and kids," to which Mayhew replied,

"'I'll show you where it's at.'"  Hr'g Tr. vol. 3, 19, June 16,

2011, ECF No. 36.

Meanwhile, Agent Lahan was still scouring the woods near

Goodall Road for drugs.  Sometime after 2:00 am, he received a

call from the station informing him of the dog's alert on

Mayhew's coat.  Although encouraged, the agents still could not

find drugs.  With no physical evidence of smuggling, Agent Lahan

ordered Agent Palma to release Driver and was on the verge of

ordering Mayhew let go as well.  But while freeing Driver, Palma

exclaimed out of frustration: "'We know you're out here

smuggling.'"  Hr'g Tr. vol. 2, 32, June 2, 2011, ECF No. 35.  In

response, Driver admitted that he had stood guard while Mayhew

went into the woods.  Driver then led the agents to where he had

waited for Mayhew, and they recommenced the drug search in that

area.  There is no evidence that Driver had known of the dog's

hit on Mayhew's coat or of Mayhew's decision to return to the

scene to aid the agents' investigation.

Even with Driver's admission, the agents were at first

unable to locate any evidence of smuggling.  Agent Lahan

testified that, frustrated, he called the station and asked to

speak with Mayhew directly.  Agent Garvey remembers the sequence

differently, and claims he called Agent Lahan first—to tell him

Mayhew had agreed to return—and then handed the phone to Mayhew.
In any event, Agent Lahan testified he told Mayhew that he "was
tired of being out here in the dark looking for the narcotics,"
and asked if Mayhew "would . . . just come up and show us where
it was." Hr'g Tr. vol. 1, 44. Mayhew asked if he could go home
after finding the drugs. Agent Lahan responded: "'No, I can't
promise you that. Will you still come up and show us?'" *Id*.
Mayhew agreed to return to the scene. Agents Seitz and Garvey
put Mayhew back into a cruiser and began driving him back to
Goodall Road.

Before Mayhew could arrive, however, the agents uncovered
two large duffel bags of what appeared to be marijuana in the
area that Driver had identified. They left the bags where they
found them. At around 3:30 am, Agent Seitz pulled up with
Mayhew in tow. Mayhew was let out of Agent Seitz's vehicle and
began immediately walking toward the woods. An agent stopped
him in mid-stride and read him his rights under *Miranda v.
Arizona*, 384 U.S. 436 (1966), and Mayhew waived them orally.
Agent Lahan explained that no one had given Mayhew *Miranda*
warnings previously because he felt that only upon discovery of
the marijuana, as incriminating evidence, did the detention
become custodial. Mayhew walked into the woods and positively
identified the same duffel bags the agents had found minutes

before, pointing to them and saying, "'There they are.'"  Tr.
vol 1, 47.

    4.  <u>Special Agents' Interview</u>

Agent Lahan instructed an agent to handcuff Mayhew and
drive him back to the Border Patrol station for processing and
further questioning.  Special Agent John O'Connor of the DEA and
Special Agent Greg Boucher of ICE (together, the "Special
Agents") arrived at the station later that morning to interview
Mayhew more closely.  At the agreement of the parties and the
Court, neither Special Agent testified in the suppression
hearings.  Tr. vol 2, at 127, 129.  Special Agent O'Connor did
provide a written Report of Investigation, detailing the
interview.  Resp. in Opp'n to Mot. to Suppress Ex. C, Feb. 7,
2011, ECF No. 22-3.

It is unclear from the Report whether the Special Agents
gave Mayhew a *Miranda* warning before interviewing him.  The
Report indicates that they understood Mayhew "had previously
been Mirandized by Border Patrol Agents," and notes that Mayhew
"stated that he understood his rights, and had agreed to answer
questions."  Resp. in Opp'n to Mot. to Suppress Ex. C, at 30,
Feb. 7, 2011.  The uncertainty for the Court is whether the
second half of that sentence, concerning Mayhew's waiver and
agreement to answer questions, refers to his Goodall Road
*Miranda* warnings or to some second set of *Miranda* warnings in

front of the Special Agents. Mayhew does not address that question in his filings. However, the government admits that Agent O'Connor did not administer new *Miranda* warnings. Resp. in Opp'n to the Mot. to Suppress 8, July 29, 2011, ECF No. 39. Given the government's interest in showing Agent O'Connor had warned Mayhew a second time, the Court places significant weight on its admission to the contrary. It thus finds that the Special Agents did not Mirandize Mayhew before interviewing him.

In the course of their interview, the Special Agents learned that Mayhew had once before picked up drugs from the same location near Goodall Road. Prior to the night of the arrests, a Burlington, Vermont man named Mark had asked Mayhew and Driver to retrieve the duffel bags and bring them to Brownington, Vermont. They were instructed to leave the drugs in a locked steel container near a trailer home. Mark was planning to collect the marijuana several days later. Mayhew expected he would be paid with marijuana that he could in turn sell for cash. Mayhew also described how, on another occasion, he and Driver had hidden a cereal box filled with cash in the Brownington steel box on Mark's request.

**B. Procedural Background**

On October 28, 2010, a federal grand jury returned a one count indictment against both Mayhew and Driver, charging them with "intentionally and knowingly aid[ing] in the importation

10

into the United States from Canada" of a substance containing
marijuana, in violation of 18 U.S.C. § 2; 21 U.S.C. §§ 952, 960.
Indictment, ECF No. 12.  On June 28, 2011, the Court approved
the government's motion to dismiss the charge against Driver.
Order Granting Stipulated Mot. to Dismiss Charge Against Jeffrey
Driver Without Prejudice, ECF No. 38.

Mayhew first moved to suppress on January 25, 2011.  After
the Court held suppression hearings, the parties filed
supplemental briefing, with the government lodging its
memorandum first.  Resp. in Opp'n to the Mot. to Suppress, July
29, 2011.  In its response, the government clarified it only
seeks to introduce two sets of evidence adduced from Mayhew's
interactions with law enforcement: (1) the deer-spotting alibi
given to Agents Lahan and Palma when first questioned on Goodall
Road, and (2) the descriptions provided to the Special Agents.
*Id.* at 14.  The government asserted it would not use Mayhew's
statements to Agents Seitz and Garvey while in the Border Patrol
holding cell, or his identification of the duffel bags
immediately after receiving *Miranda* warnings.  *Id.*

Mayhew then filed a post-hearing motion to suppress that
renewed his Fourth Amendment and *Miranda* objections to admitting
all evidence and fruits of the evidence obtained from him that
morning.  Def.'s Post-Hr'g Mem. in Supp. of Mot. to Suppress,
Oct. 6, 2011.  He also moved to expand the scope of the motion

11

to exclude statements and testimony anticipated to be offered against him by Driver.  Curiously, the filing does not respond to the government's intent to admit the contents of the Special Agents' interview, although Mayhew contends that a ruling in his favor would leave the government "with basically no evidence," *id.* at 11, and that "all of the evidence against him" should be excluded, Mot. to Suppress 10, Jan. 25, 2011.

## II. Discussion

In deciding Mayhew's motion, the Court must pinpoint when during the agents' investigation Mayhew suffered constitutional violations that require exclusion of evidence.  The most useful division in the morning's events is between the roadside stop in which Agent Lahan first intercepted Mayhew and Driver, on the one hand, and the subsequent stationhouse interview and the events following it, on the other.

### A. Constitutional Validity of the Stop on Goodall Road

At the threshold, Mayhew argues that Agent Lahan lacked reasonable suspicion to detain him on Goodall Road, violating the Fourth Amendment.  He also contends that the initial interaction was a custodial interrogation that required the agents to inform him of his rights under *Miranda*, a measure they did not take until hours later.  It was in this initial encounter that Mayhew provided the explanation, later proved false, that he and Driver had been scouting deer when they were

abandoned by Emerson.  It was also at this time that the agents

first observed Mayhew's several layers of clothing covered in

dirt and burdocks, his lack of identification, cell phone, or

equipment for scouting deer, and his connection to Emerson.

Because of the illegal stop and questioning, Mayhew contends all

this evidence, and virtually everything the agents obtained

subsequently, must be suppressed.

    1. <u>Fourth Amendment Claim</u>

The Fourth Amendment's prohibition against unreasonable

seizures is implicated only when a person's "freedom of movement

is restrained" by "physical force or a show of authority."

*United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  Here,

the government does not dispute that Mayhew was seized within

the meaning of the Fourth Amendment, but argues the seizure was

justified under *Terry v. Ohio*, 392 U.S. 1 (1968).  Resp. in

Opp'n to Mot. to Suppress 8-9, July 29, 2011.

*Terry* permits officers to "stop and briefly detain a person

for investigative purposes if the officer has a reasonable

suspicion supported by articulable facts that criminal activity

'may be afoot,' even if the officer lacks probable cause."

*United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*,

392 U.S. at 30).  The reasonable suspicion standard "is not a

high threshold." *United States v. Lawes*, 292 F.3d 123, 127 (2d

Cir. 2002).  The stop must be supported by a "'particularized

and objective basis'" for suspicion of legal wrongdoing under
the "'totality of the circumstances.'" *United States v.
Simmons*, 560 F.3d 98, 103 (2d Cir. 2009) (quoting *United States
v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal citation and
quotations omitted). It cannot rest on an "'inchoate and
unparticularized suspicion or hunch.'" *Sokolow*, 490 U.S. at 7
(quoting *Terry*, 392 U.S. at 27 (internal quotations omitted)).
It must be based solely on the facts available to the officer at
the time of the stop, *United States v. Muhammed*, 463 F.3d 115,
121 (2d Cir. 2006), and courts must review it "through the eyes
of a reasonable and cautious police officer on the scene, guided
by his experience and training." *United States v. Padilla*, 548
F.3d 179, 187 (2d Cir. 2008) (internal citations omitted).

At the time of the stop, Agent Lahan had reasonable
suspicion to detain and question Mayhew. Goodall Road is
situated just a quarter mile from the United States-Canada
border in the path of smugglers. In the agents' experience, the
rainy, cold conditions were prime for drug trafficking. The
reputation of an area for crime is a factor on which law
enforcement may permissibly rely in developing a reasonable
suspicion about a particular suspect. *United States v. Magda*,
547 F.2d 756, 758 (2d Cir. 1976) (citing *United States v.
Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975)). That is also true

in the particular case of border areas.  *United States v. Singh*, 415 F.3d 288, 294 (2d Cir. 2005).

In addition, Agents Lahan and Palma had stopped two cars earlier in the night for driving in looping patterns along Goodall Road.  While the stops yielded scant evidence of wrongdoing, they became more suspicious when Agent Lahan learned, through report of the 911 call, that two men were stranded and on foot nearby.  It would be strange, at 1:00 am in an isolated, rural area in poor weather, to find two men walking alone.  It is true, as Mayhew suggests, that all of the above-mentioned data could have a noncriminal explanation.  But as the Supreme Court has emphasized, even acts that would appear innocent in isolation can raise red flags of suspicion to a trained eye in light of surrounding circumstances.  *Arvizu*, 534 U.S. at 274-75, 277-78.  It was a reasonable inference for Agent Lahan to suspect, based on his experience patrolling the border and his observations that night, that the men might have a connection to at least one of the suspicious drivers with empty cars he had stopped previously.  Moreover, it was reasonable to suspect that the men and the drivers combined might be engaged in smuggling.  When Agent Lahan saw two men walking down Goodall Road moments later, he logically could have concluded that they were the two men who were the subject of the 911 call.  Under

the totality of the circumstances, those facts gave Agent Lahan reasonable suspicion to briefly stop them.

The next question is whether the initially valid *Terry* stop was reasonable in duration and scope. A *Terry* stop "must be as minimally intrusive as possible, bearing in mind the circumstances that gave rise to the suspicion." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995). In deciding whether the particular events of the stop made it unreasonable, the Court looks to "the law enforcement purposes to be served by the stop [and] the time reasonably needed to effectuate those purposes," to discover "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985). Relevant factors to consider include:

> (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

*United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004). There is no bright line between a *Terry* stop and an arrest-like seizure. *United States v. Madison*, 936 F.2d 90, 94 (2d Cir. 1991) (citing *Florida v. Royer*, 460 U.S. 491, 506 (1983)). At some point, however, the conditions of a *Terry* stop may approach that of an arrest. *Tehrani*, 49 F.3d at 60. In that case, any

16

further encounter between the suspect and law enforcement must be justified by probable cause. *See Royer*, 460 U.S. at 498.

Agent Lahan first stopped Mayhew and Driver just before 1:00 am. He ordered them against the hood of his car and frisked them.[4] About a minute later, Agent Palma arrived, and the two agents began questioning the men and learned Mayhew's deer scouting story. At approximately 1:15 am, the remaining agents had arrived and Agent Lahan ordered the two men separated. Once separated from Driver, Mayhew did not speak with the agents about the events of the night until Agent Seitz interviewed him in the Border Patrol station's holding cell. Assuming, as the Court does, that Mayhew made no pertinent statements from 1:15 am until he reached the station, the relevant inquiry is whether the approximately fifteen minute stop was reasonable in scope and duration to comply with *Terry*.

Although there is no clear time limit placed on *Terry* stops, *Sharpe*, 470 U.S. at 685, a fifteen minute detention is not per se unreasonable, s*ee Tehrani*, 49 F.3d at 61 (finding that a 30 minute stop is not per se unreasonable, and collecting cases with similar holdings). Officers are also permitted to question the suspect related to the limited purpose of the stop. *Royer*, 460 U.S. at 497-98. In fact, "the right to interrogate during a

---

    [4]    Mayhew did not challenge the reasonable basis for the frisk, so the court does not address whether it was justified.

'stop' is the essence of *Terry* and its progeny." *United States v. Oates*, 560 F.2d 45, 63 (2d Cir. 1977).

The stop, until 1:15 am, had been relatively brief. Prior to separating Mayhew and Driver, only two agents were present, and their questions merely concerned the suspects' identities and reasons for being out on foot at that early hour. In other words, the questions were precisely aimed at either confirming or dispelling Agent Lahan's reasonable suspicions as to Mayhew's and Driver's activities. Neither man was handcuffed, nor, to that point, placed into a Border Patrol agent's car or other confined space. While Agent Lahan ordered both men to place their hands on the hood of his cruiser, he did not display a weapon or threaten them. Under those circumstances, the Court finds the stop was reasonable in duration and scope as to comply with *Terry*.

## 2. *Miranda* Claim

Mayhew also argues that, regardless of the reasonableness of the *Terry* stop, the agents were required to give him *Miranda* warnings from the time Agent Lahan arrived at the scene. Def.'s Post-Hr'g Mem. in Supp. of Mot. to Suppress 11, Oct. 6, 2011. Since the Fourth and Fifth Amendments vindicate different liberty interests, a valid *Terry* stop may still impinge on its target's *Miranda* rights. *United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995) ("[W]hether the 'stop' was permissible under

*Terry* . . . is irrelevant to the *Miranda* analysis.")  The
government contests only that Mayhew was in custody while
detained alongside Goodall Road, but does not dispute that he
was interrogated.  *See* Resp. in Opp'n to the Mot. to Suppress
14-15, July 29, 2011.

In evaluating whether custody exists to trigger *Miranda*,
the Court's "'ultimate inquiry'" is "'whether there is a formal
arrest or restraint on freedom of movement of the degree
associated with a formal arrest.'"  *Id.* at 670 (quoting
*California v. Beheler*, 463 U.S. 1121, 1125 (1983) (in turn
quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)) (internal
quotations omitted)).  The Court looks to the "circumstances
surrounding the interrogation."  *Thompson v. Keohane*, 516 U.S.
99, 112 (1995).  Relevant are the length and location of the
interrogation, *Tankleff v. Senskowski*, 135 F.3d 235, 244 (2d
Cir. 1998), the use of restraints, *New York v. Quarles*, 467 U.S.
649, 655 (1984), and statements made by the agents regarding
whether or not the person is under arrest, *United States v.
Badmus*, 325 F.3d 133, 138 (2d Cir. 2003).  Of less relevance,
however, are the subject's and the questioning officer's
subjective, uncommunicated views of the situation.  *Stansbury v.
California*, 511 U.S. 318, 323-24 (1994).

In the case of a *Terry* stop, it is instructive to examine
whether a reasonable person in the position of the defendant

"would have understood that his detention was not likely to be 'temporary and brief'" or that she "was 'completely at the mercy of the police.'" *Newton*, 369 F.3d at 675 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984)).

At this initial stage in the morning's events, Mayhew was not arrested nor subject to conditions approaching arrest that would invoke *Miranda*. Mayhew was not restrained by handcuffs or confined inside a vehicle or the Border Patrol station. The officers did not draw their weapons or threaten Mayhew with arrest. The agents had made no indication that the stop would be prolonged. Rather, Mayhew had been frisked and questioned for approximately fifteen minutes by two officers outdoors at the side of an isolated road at a late hour. That alone does not amount to a custodial interrogation.

Since Mayhew's Fourth Amendment and *Miranda* rights had not been violated by the time he made his initial exculpatory statements to the agents, those statements and related evidence cannot be suppressed. The Court denies the motion to suppress as to this period of time.

### B. Mayhew's Statements at the Station, Post-*Miranda* Identification, and the Special Agents' Interview

The Court next addresses whether, in spite of the initial legality of the seizure and questioning, Mayhew's Fourth Amendment and *Miranda* rights were violated when he reached the

Border Patrol station.  After reaching the station, Mayhew was grilled further on his deer scouting story, ultimately agreeing to show the agents where "it" was.  During that time, the agents also obtained a drug-sniffing dog's positive alert on Mayhew's coat.  Finally, after receiving *Miranda* warnings, Mayhew pointed out the duffel bags containing marijuana.  As before, the Court first examines whether Mayhew's Fourth Amendment rights were abridged and then turns to the question of whether *Miranda* should have applied.

    1. <u>Fourth Amendment Claim</u>

The government concedes that the initial stop's *Terry* justification no longer supported Mayhew's detention after he and Driver were separated.  Resp. in Opp'n to Mot. to Suppress 11, July 29, 2011.  It agrees the stop converted to an arrest at that point, but it contends the arrest was properly supported by probable cause.  *Id.*  Mayhew does not address whether the station interview was an unlawful arrest, confining his Fourth Amendment argument to the initial *Terry* stop.  Having already found the *Terry* stop legitimate, the question for the Court is whether probable cause in fact existed for the arrest and, if not, whether the statements and evidence obtained due to the arrest should be suppressed.

Law enforcement must justify an arrest or any stop equivalent to an arrest with probable cause.  *United States v.*

*Ceballos*, 654 F.2d 177, 181-82 (2d Cir. 1981). The government has the burden of proof to establish probable cause existed to arrest the defendant. *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008). Although it cannot be "reduced to a neat set of legal rules," *Illinois v. Gates*, 462 U.S. 213, 232 (1983), probable cause to detain exists when police "have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996)). It only requires "such facts as make wrongdoing or the discovery of evidence thereof probable." *Walczyk*, 496 F.3d at 157.

The Court must review the totality of the circumstances from "the perspective of a reasonable police officer in light of his training and experience." *Delossantos*, 536 F.3d at 159. As in the case of reasonable suspicion, viewing the situation from the officer's perspective means that arguably innocent acts should not be discounted if the officer has discerned in them likely criminal "'patterns of behavior'" that are "'specific and articulable.'" *Delossantos*, 536 F.3d at 161 (quoting *United States v. Price,* 599 F.2d 494, 501 (2d Cir. 1979) (in turn quoting *Oates,* 560 F.2d at 61)) (internal quotations omitted)).

At the time Mayhew arrived at the station, the agents had not yet used a dog to test his coat for traces of marijuana, they had not yet extracted a confession from Driver, and they had not yet discovered the narcotics they believed to be in the woods. On the other hand, they had circumstantial evidence of wrongdoing. Mayhew's appearance made it seem he had just emerged from the woods instead of from Emerson's car. He also did not have the equipment required for scouting deer, like a flashlight or a gun, and he was not carrying identification or a cell phone. Mayhew and Driver were walking on a remote road in the early hours of the morning near the border. Finally, they had asked to use a phone to seek a ride on a night in which Agents Lahan and Palma had also stopped their earlier ride, Emerson, for driving in a manner consistent with smuggling activity.

The Court finds that the evidence available to the agents did not amount to probable cause that Mayhew had committed a crime. Significantly, Agent Lahan testified he had insufficient evidence to hold the two men and would have released them were it not for Driver's unexpected confession. Indeed, at the point Mayhew arrived at the station, around 1:30 am, there was no evidence that could trace his conduct to drug smuggling or any other crime in particular. While it is appropriate to attribute a common enterprise to a car's driver and its passengers,

*Maryland v. Pringle*, 540 U.S. 366, 373 (2003), the agents found little concrete to suggest that Emerson had participated in any wrongdoing during their traffic stop earlier. No person had seen Mayhew, Driver, or Emerson engage in criminal behavior. There was no reasonably trustworthy information, such as from a witness or an informant, that a crime had been or was about to be committed in the vicinity, let alone that Mayhew was a participant in such activity. Finally, there was no evidence of drugs.

In addition, there was not yet a strong indication that Mayhew's exculpatory statements were lies. Mayhew's appearance could have been consistent with scouting deer in the woods on a cold, rainy night. Any additional equipment he and Driver may have needed to accomplish that task could have simply been left in Emerson's car at the time Emerson had abandoned them. Emerson, hours before, had echoed the same deer scouting rationale when pulled over. Nor did the men behave suspiciously when approached and questioned, unlike in *United States v. Garcia*, 179 F.3d 265 (5th Cir. 1999), which the government cited and which presented more compelling grounds for probable cause than here. Under the totality of the circumstances, the agents were not justified in placing Mayhew under arrest at the time he was brought to the station.

Finding that the detention in the stationhouse violated
Mayhew's Fourth Amendment rights, the Court next confronts the
issue of what statements and evidence it must suppress as a
result.  The question in distinguishing evidence to be excluded
by the breach and that which is nonetheless admissible is
"'whether, granting establishment of the primary illegality, the
evidence to which instant objection is made has been come at by
exploitation of that illegality or instead by means sufficiently
distinguishable to be purged of the primary taint.'"  *Brown v.
Illinois*, 422 U.S. 590, 599 (1975) (quoting *Wong Sun v. United
States*, 371 U.S. 471, 488 (1963) (internal citation and
quotations omitted)).

As an initial matter, the Court must exclude "statements
given during a period of illegal detention . . . if they are the
product of the illegal detention and not the result of an
independent act of free will." *Royer*, 460 U.S. at 501.  As
such, the Court will suppress all statements Mayhew made while
in the station but prior to receiving his *Miranda* warnings,
including his admission that he could show the agents the
location of the drugs.  Those statements spring immediately from
his unlawful arrest, which brought him to the station for
interrogation.

A further question is whether the *Miranda* warnings Mayhew
received prior to identifying the duffel bags sufficiently

purged the taint of the unlawful arrest such that his post-warning statements are admissible. A valid *Miranda* warning cannot alone demonstrate that a confession is sufficiently voluntary and independent of an illegal arrest to justify admission. *Dunaway v. New York*, 442 U.S. 200, 216-17 (1979). Rather, the *Miranda* warnings are but one factor in a multifactor analysis the Court must undertake to determine whether the distinct interests of the Fourth Amendment would be satisfied in admitting the statements. *Id.* at 218-19. The burden of showing such post-warning statements are admissible rests with the government. *Brown*, 422 U.S. at 604.

Neither the government nor Mayhew, however, briefed the issue of whether an unlawful arrest would require suppressing Mayhew's post-*Miranda* statements. Without the benefit of either party's position, the Court declines to rule on the question today. Since, as will be described in the section that follows, Mayhew's identification of the duffel bags and statements to the Special Agents should be excluded in any case on *Miranda* grounds, reaching the issue is also presently unnecessary.

## 2. *Miranda* Claim

Mayhew claims that he was in police custody during nearly the entire episode. For its part, the government does not contest that Mayhew entered custody when he arrived at the Border Patrol station. Resp. in Opp'n to the Mot. to Suppress

14, July 29, 2011.  The Court agrees with the parties and finds
Mayhew was in custody, interrogated, and entitled to receive
*Miranda* warnings when he reached the station for questioning.

Not all interactions with law enforcement at a police station
are subject to *Miranda*'s requirements.  *See Yarborough v.
Alvarado*, 541 U.S. 652, 661-65 (2004).  Of significance are
whether the defendant went to the station voluntarily and left
freely at the interview's conclusion, the length of the
interview, and whether the defendant experienced coercive
pressure or arrest.  *Id.* at 664-65; *Oregon v. Mathiason*, 429
U.S. 492, 495 (1977).

Here, Mayhew apparently volunteered to go to the station,
was told at Goodall Road that he was not under arrest, and was
not handcuffed.  However, regardless of whether Mayhew initially
consented to the trip, there is no indication that he agreed to
the conditions of confinement he faced once at the station.  At
that time, a reasonable person in his position would have felt
restrained by circumstances tantamount to formal arrest.  Mayhew
had been transported from the scene in the caged backseat of an
agent's cruiser.  He arrived at around 1:30 am, having already
been seized by agents for thirty minutes.  He was taken inside,
where Agent Seitz removed his coat for evidence.  He was put
into a holding cell and he was kept under lock or supervision
during his entire stay.  He remained in the cell for over an

hour and a half, until after 3:00 am, and was escorted out only when he agreed to return to Goodall Road.

Tellingly, Mayhew was treated nearly identically when he returned to the facility, several hours later, after identifying the duffel bags. At that point, all concede, he was under arrest. The only significant differences the Court can discern in his treatment, however, were that he was made to wear handcuffs and formally booked and processed. The totality of the circumstances indicate that Mayhew's detention at the station was a virtual arrest, rising to the level of custody required to invoke *Miranda*.

Since during that time Mayhew was questioned repeatedly by Agents Seitz and Garvey, as well as prodded to confess over the phone by Agent Lahan, the Court has no difficulty concluding that the encounter was an "interrogation" for purposes of *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Thus, Mayhew's station interview was a custodial interrogation, at the start of which he should have received *Miranda* warnings. Since he was not put on notice of his rights, no statements obtained during that time can be used in the prosecution's case-in-chief. *Miranda*, 384 U.S. at 445; *Harris v. New York*, 401 U.S. 222, 226 (1971).

A second issue is whether Mayhew's subsequent identification of the duffel bags should also be excluded, even

though it occurred after Mayhew had finally received *Miranda*
warnings and waived his rights.  While Mayhew did not address
the issue, the government obliquely did.  It appears to grant,
without specifically conceding the point, that Mayhew's post-
warning identification of the drugs is inadmissible.  Resp. in
Opp'n to Mot. to Suppress 14, 15, July 29, 2011.  Even if the
government will not openly embrace that view, the Court will,
and it orders the post-warning identification excluded on
*Miranda* grounds.

The "fruit of the poisonous tree" theory applicable to
Fourth Amendment violations does not pertain to voluntary
confessions made after receiving *Miranda* warnings that follow
prior, unwarned confessions.  *Missouri v. Seibert*, 542 U.S. 600,
612 n.4 (2004) (plurality opinion) (citing *Oregon v. Elstad*, 470
U.S. 298, 308 (1985)).  In such cases, the Second Circuit
applies a test derived from Justice Kennedy's controlling
concurring opinion in *Seibert*, 542 U.S. at 618-22.  *United*
*States v. Capers*, 627 F.3d 470, 476 (2d Cir. 2010) (citing
*United States v. Carter*, 489 F.3d 528, 535 (2d Cir. 2007)).

As a general matter, if both the pre- and post-*Miranda*
confessions were obtained voluntarily, the Court need look no
further in sustaining the post-warning statement's
admissibility.  *Carter*, 489 F.3d at 534; *see Seibert*, 542 U.S.
at 622.  This rule springs from the Supreme Court's decision in

*Elstad*, which held that "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement [that preceded it] inadmissible." 470 U.S. at 310-11. An exception to the general *Elstad* rule arises when the interrogating officer's failure to warn was the result of "a deliberate, two-step strategy" to extract a post-warning confession. *Carter*, 489 F.3d at 536; *Seibert*, 542 U.S. at 622. In that case, unless the officer took "curative measures," the post-warning statements must be excluded, regardless of whether they were voluntary. *Seibert*, 542 U.S. at 622.

In *Capers*, the Second Circuit examined Justice Kennedy's *Seibert* opinion at length, and excluded a post-warning confession because investigating agents had failed to issue *Miranda* warnings before an earlier confession. 627 F.3d 470. The decision makes clear that *Seibert* applies beyond its exceptional facts—where officers admitted openly to using a two-step strategy. *United States v. Williams*, 758 F. Supp. 2d 287, 309-10 (S.D.N.Y. 2010). The court echoed the *Seibert* plurality's view that such dispositive evidence is neither required to show deliberateness nor likely to be encountered. *Capers*, 627 F.3d at 478-79, 483. Rather, the *Capers* inquiry puts the onus on the government to justify the decision to delay *Miranda* warnings. *Williams*, 758 F. Supp. 2d at 310.

It held that the prosecution bears the burden of proving that law enforcement did not rely on a deliberate two-step interrogation strategy to undermine *Miranda*, and it must make its proof by a preponderance of the evidence. *Id.* at 479-80. In determining whether the government has met its burden on deliberateness, courts should look at the "the totality of the objective and subjective evidence surrounding the interrogations . . . with a recognition that in most instances the inquiry will rely heavily, if not entirely, upon objective evidence." *Id.* at 479. Objective indicators weighing in favor of a deliberateness finding include: (1) overlap between the defendant's pre- and post-warning statements; (2) similarity in the group of officers involved in both interrogations; and (3) the extent to which the post-warning questioning appears merely to be a continuation of the pre-warning interview. *Id.* at 478.

If the government fails to carry its burden on deliberateness, the next issue is whether the officers nonetheless saved the admissibility of the post-warning statements by applying "curative measures." *Id.* at 484. The two main steps police might take to cure a problem posed by a deliberate two-step interrogation are: (1) allowing "'a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning;'" and (2) "'[adding] an additional warning that explains the likely

inadmissibility of the prewarning custodial statement.'" *Id.* at 476 (quoting *Seibert*, 542 U.S. at 622).

In the present case, the government has not carried its burden to disprove deliberateness beyond a preponderance of the evidence. Agent Lahan testified, when asked why he did not read Mayhew his *Miranda* warnings before putting him into Agent Seitz's cruiser: "[Mayhew and Driver] were being detained while we investigated a little further. . . . And without being able to link them to the narcotics, there was no case. So in my mind it was noncustodial at the time." Tr. vol 1, 37-38. Agent Garvey explained that he and Agent Seitz did not Mirandize Mayhew at the station because: "There was no criminal charge at that time. . . . [W]e were just investigating to see if his story was true." Tr. vol 3, 16-17. Those statements indicate that the agents were determining whether custody existed solely based on the strength of their case, rather than on the extent to which they restrained Mayhew's liberty. That approach to *Miranda* unconstitutionally extended the unwarned portion of the interrogation until Mayhew was prepared to confess.

The Court does not doubt the agents' best intentions and dedicated police work in responding to an apparent crime, but that alone cannot sustain the government's burden of proof. "'Once a law enforcement officer has detained a suspect *and subjects him to interrogation* . . . there is rarely, if ever, a

legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed.  Instead, the most plausible reason . . . is an *illegitimate* one.'"  *Capers*, 627 F.3d at 480-81 (quoting *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006)).

The objective evidence is also insufficient to satisfy the government's burden of proof.  There was virtually no break between the pre-warning interrogation and the post-warning identification.  Mayhew's pre-warning willingness to point out the drugs overlapped completely with his post-warning identification of them.  Pre-warning, he was interrogated by Agents Lahan, Seitz, and Garvey; post-warning, he made the identification in front of the same group, plus several other agents at the scene.  Importantly, his identification flowed nearly seamlessly from his station interview.  Before receiving his *Miranda* warnings, Mayhew never left the agents' custody—in fact, he was issued his warnings as he was walking to the woods to point out the duffel bags. Finally, Mayhew's pre-warning interview was lengthy and in the formal environment of the station, *cf. Seibert*, 542 U.S. at 604-05; *Capers*, 627 F.3d at 472-73, rather than brief, informal, and at a home or place of business, *see Elstad*, 470 U.S. at 300-01; *Carter*, 489 F.3d at 532.  Mayhew stuck doggedly to the deer scouting story for about two hours by the time he admitted he could pinpoint the drugs.

Those factors show the government could not adequately disprove that the officers' deliberately withheld Mayhew's *Miranda* warnings.

In spite of that finding, the post-warning confession would still be admissible if the agents had taken subsequent "curative measures" to ensure Mayhew understood the consequences of waiving his *Miranda* rights. *Capers*, 627 F.3d at 476. The two main curative measures are a substantial break in "time and circumstances" between pre- and post-warning statements, and an additional warning to explain that the pre-warning statement is likely not admissible. *Id.* at 484. As to Mayhew, the agents took neither step. There was only about a half hour between when Mayhew agreed to show the agents the drugs and when he received his *Miranda* warnings, and he was in their custody throughout that time. The agents gave Mayhew the standard *Miranda* warning, without elaboration, and only obtained an oral waiver. They did not provide time for Mayhew to deliberate on whether to confess; immediately after hearing the warnings, he walked into the woods to point out the duffel bags. In those circumstances, the Court finds that Mayhew's post-warning identification is inadmissible along with his pre-warning stationhouse admission.

The interview with DEA Agent O'Connor and ICE Agent Boucher followed several hours after the post-warning identification.

The government has the burden of proving Mayhew's statements to them were not the product of a deliberate two-step interrogation strategy, and the Court finds the government has failed to make such a showing on the present record. As just described, the government did not adequately prove that the *Miranda* warning actually given cured a deliberate failure to warn that preceded it. Furthermore, as discussed in the Factual Background section, the Court finds that the Special Agents' interview was not accompanied by fresh *Miranda* warnings. Since the government has failed to show that the agents—Border Patrol, DEA or ICE— gave any meaningful *Miranda* warnings to Mayhew, the Court cannot find that the interview with the Special Agents complied with *Miranda*. For that reason, it will exclude the statements Mayhew made to the Special Agents.

The Court makes this ruling without prejudice to the government, which did not have the benefit of any analysis by Mayhew or today's ruling on the admissibility of the post-warning identification before briefing the issue. Moreover, a significant period of time elapsed between Mayhew's unlawful station interrogation with the Border Patrol Agents and his later interview with the Special Agents. In addition, it appears that the Special Agents relied on the prior *Miranda* warnings' validity in deciding not to give ones of their own. Resp. in Opp'n to Mot. to Suppress Ex. C, at 30, Feb. 7, 2011.

As such, the Court would entertain the government's pre-trial request for an additional suppression hearing if the government determines fresh *Miranda* warnings were in fact given by the Special Agents. Following such a request, the Court would permit additional briefing on the issue, so Mayhew might address the legal questions involved and the government could supplement its arguments in response. Afterwards, the Court would revisit its ruling as to the Special Agents' interview.

## C. **Driver's Anticipated Trial Testimony**

Mayhew also moved to expand the scope of the evidence suppressed to include testimony Driver might give against him at trial. The Fourth Amendment exclusionary rule precludes testimony obtained from live witnesses as a result of an unconstitutional search or seizure of the defendant. *United States v. Leonardi*, 623 F.2d 746, 751 (2d Cir. 1980). It is clearly settled that defendants may not raise violations of a third party's Fourth Amendment rights to suppress evidence at trial. *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).

As to *Miranda*, rights secured under the Fifth Amendment's Self-Incrimination Clause are purely personal. *Couch v. United States*, 409 U.S. 322, 328 (1973) ("The Constitution explicitly prohibits compelling an accused to bear witness 'against himself': it necessarily does not proscribe incriminating statements elicited from another.") Any remedy for a violation

of *Miranda* should "maintain the closest possible fit [with] the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 643 (2004) (plurality opinion). To suppress the fruits of a *Miranda* violation, the evidence, if admitted, must at least create a "risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *Id.; see also id.* at 645 (Kennedy, J. concurring opinion) ("Admission of nontestimonial physical fruits (the Glock in this case), even more so than . . . postwarning statements to the police . . . does not run the risk of admitting into trial an accused's coerced incriminating statements against himself.")

Mayhew cannot point to any anticipated testimony of Driver's that would be a product of a constitutional violation Mayhew suffered. He does propose that the initial stop violated his and Driver's Fourth and Fifth Amendment rights simultaneously, allowing him to challenge Driver's subsequent admissions as a fruit of that violation as in *United States v. Ienco*, 182 F.3d 517 (7th Cir. 1999). In *Ienco*, the district court had ruled inadmissible testimony offered by an erstwhile co-defendant, Iovine, against the defendant, Ienco, secured as a result of an illegal detention involving both men. *Id.* at 521-22. The Seventh Circuit held that the Fourth Amendment violations they endured together could not "be causally separated," *id.* at 529 n.13, and "[were] so inexorably linked"

to Iovine's decision to testify to make the testimony a fruit of Ienco's unlawful seizure, *Id.* at 532.

The problem with applying that case to the present facts is that the initial roadside stop complied with both *Terry* and *Miranda*. After the initial stop, Mayhew and Driver were separated and questioned independently. While Mayhew did suffer deprivations of his Fourth Amendment rights and *Miranda* protections upon reaching the station, the record is clear that none of those violations either led the agents to discover Driver as a witness or had any influence on Driver's potential testimony. Driver confessed to his look-out role and identified the location of the duffel bags on his own, before Mayhew's confession and with no apparent influence stemming from the unconstitutional detention and interrogation Mayhew endured.

Thus, even if *Ienco* controlled in this circuit, it would be inapplicable to the present case. Here, there is not even the causal relationship between the illegality Mayhew suffered and Driver's testimony that is required, but not sufficient, to exclude statements as tainted by violations of the defendant's Fourth Amendment rights. *United States* v. *Ceccolini*, 435 U.S. 268, 274 (1978). Lacking that fundamental link, the Court need not evaluate Mayhew's discussion of Driver's willingness to testify. Nor, proceeding from the standpoint of *Miranda* and the Fifth Amendment, would it further Mayhew's right to avoid self-

incrimination to exclude Driver's separately-procured testimony. The Court denies the motion to expand the scope of the evidence suppressed to include Driver's anticipated testimony.

### III. Conclusion

To summarize, Mayhew's motion to suppress is denied as to: (1) any of Mayhew's statements or evidence obtained as a result of the initial stop on Goodall Road, and (2) Driver's anticipated testimony.  It is granted as to statements and evidence collected during Mayhew's first detention and interrogation by Border Patrol Agents at the station and his subsequent identification of the duffel bags.  It is also granted, without prejudice, as to Mayhew's interview with Special Agents O'Connor and Boucher.

Dated at Burlington, in the District of Vermont, this 21st day of November, 2011.

/s/William K. Sessions III___
William K. Sessions III
U.S. District Court Judge